UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | Criminal No. 21-10354-WYG |
| ) | |
| JAMES RODRIGUES ) | |

**Sentencing Memorandum**

Defendant James Rodrigues submits this memorandum to assist the court in determining a reasonable sentence that is sufficient but not greater than necessary to promote sentencing goals. That sentence, for this defendant who committed these offenses, is time-served.

James has already served over 33 months, which is the equivalent of a 39-month sentence once adjusted for good time (39 months x 85% = 33.1 months). That is within the 37-46-month guideline range (CH Category I) that the parties have calculated and agreed to.

It is a sentence that takes into consideration James' history and characteristics, most notably his proven and sustained track record of mentoring youth that come from backgrounds similar to his so that they are prepared to make better life choices than he made. It is a sentence that acknowledges that James has the maturity, skill set, and support network that will enable him to lead a responsible and law-abiding life upon release.

It is also a sentence that is sufficiently punitive and deterrent. It reflects James' relative culpability compared with the criminal conduct of his codefendants. His racketeering activity is limited to possession with intent to distribute and distribution of a controlled substance. He was not involved in any of the alleged violent conduct attributed to some of his codefendants. He was not a leader, manager, or decision maker of the racketeering enterprise.

**Argument**

1. **A Time-Served Sentence is Reasonable Given Rodrigues' History and Characteristics**

James Rodrigues stands out from most defendants sentenced in this court for RICO and controlled substance offenses. Those defendants, by and large, have made calculated decisions to earn a living selling drugs. They typically think only short term and are motivated solely by what is best for them, not for others who depend on them. Few are in committed relationships, play an active role in the lives of their children, or provide adequate financial support. Not many are motivated to obtain a legitimate job or are capable of holding a job for any period of time.

James has done all of that. He is in a committed relationship, is active in the life of his 12 year-old daughter, and provides guidance and emotional and financial support. At the time of his arrest, he was a member of the sheet metal workers union and had a good job. He was working on obtaining a real estate license and had completed 40 hours of training and a Harvard extension course on contract law.

What most distinguishes James from the mine-run of defendants who stand before the court for sentencing in RICO and drug distribution cases is his devotion to helping disadvantaged youth make better choices than he made and choose a better path in life. Five persons who have known and interacted with James for most of his life have written letters of support which describe in detail the kind of person James is.

At his mother's urging, James left the life he knew in Boston as a child and moved to Hamilton Massachusetts to live with the family of his basketball coach, Zach Zegarowski. Zach's wife Mandy Carter-Zegarowski describes James as a kind and insightful person with a huge heart

who excelled in school, on the basketball court, and socially. Zach not only coached James, he was also a mentor who imparted life skills and empowered James to discover his strengths. *See* Letter from Zach Zegarowski and Mandy Carter-Zegarowski, attached as Exhibit 1.[1]

James attended school with Zach and Mandy's oldest son, Michael Carter-Williams. Michael describes James as his brother. They were high school basketball teammates. Michael became a first round NBA draft pick and was named NBA Rookie of the Year. Michael wrote that although James had made decisions that were not always right, Michael never questioned James true character. Michael described James as a loving father who takes care of his daughter and is there for whatever she needs. He also described James' "special ability to connect with kids." *Id*.

James returned to Boston once Michael Carter Williams transferred to a private high school, but he did not lose touch with the Carter-Zegarowski family or lose his special ability to connect with kids. James coached a youth AAU basketball team in a program that the Carter-Zegarowskis had started. Mandy wrote that James taught his players values beyond basketball. He sacrificed to make it possible for his players to participate. James picked them and drove them to practices and games, and helped raise funds through the Carter-Zegarowski's 501 C3 charitable organization. *Id*.

When Michael started to lose his way in the NBA and needed to rekindle his commitment to do what was necessary to continue to perform at a high level and excel, he called on James. James traveled with Michael, implemented a rigorous training program, and helped Michael focus on what was important for his continued success. Michael is now retired from the NBA

---

[1] Several letters of support are attached as Exhibit 1 in the order in which they are cited.

and currently operates an organization that has partnered with the City of Boston to provide mental health and mindfulness workshops for high school basketball players.[2]

James no doubt has the skill set to step into that program with Michael and resume his efforts mentoring and helping Boston youth. Jack O'Brien, a teacher/coach who knew James well during his school years and has kept in contact with James since then, described how James had "dedicated himself to giving back to the youth, coaching and mentoring them." *Id*. O'Brien wrote that the "youngsters have developed a strong bond and trust in James" and noted "the impact he has on our kids who desperately need" what James has to offer. *Id*.

Another letter writer, Tony Galvao, who does community work in Dorchester and Roxbury, wrote that James "is the perfect bridge between these neighborhood kids and many positive outlets." *Id*. Galvao describes James' "devotion and willingness to go above and beyond for the young people … he is dependable, reliable, hard-working, conscientious, honest, peace-loving, and courteous." *Id*.

James' accomplishments prior to his arrest show a level of maturity, self reflection, and the ability to put criminal conduct behind him. Turning himself in once he was aware of the charges against him is another sign of maturity. He did not try to run or hide. He made the responsible decision to face the consequences of his criminal conduct.

It is time to get James back to doing what he cares so deeply about and is so very, very good at - being a father to his daughter and providing her and other young people in the City of

---

[2] A recent article in the Boston Globe describes the partnership. *See* "NBA veteran assists with Boston's youth sports development," available at https://www.bostonglobe.com/2024/11/15/metro/nba-veteran-assists-with-bostons-youth-sports-development/

Boston with an understanding of the values and drive that it takes to stay on the right path and succeed.

    **2.    A Time-Served Sentence is Sufficiently Punitive and Deterrent**

A time-served sentence is within the advisory guideline range once adjusted to reflect good time. It is, by definition, a reasonable sentence. *See U.S. v. Ortíz-Mercado*, 919 F.3d 686, 691 (1st Cir. 2019) ("a district court sentence that falls within the guideline range deserves a presumption of reasonableness") (citations omitted); *United States v. Elliott*, 113 F.4th 168, 174 (1st Cir. 2024) ("A sentence that falls within the guideline sentencing range for a given offense is rarely outside the universe of reasonable sentences for that offense") (citations omitted).

It is a sufficiently punitive and by no measure an improperly lenient sentence, particularly where James has never served time in jail. It is also a sufficient sentence when viewed in conjunction with the sentences for the all of the RICO codefendants in this case, which is an important part of the framework for assessing the reasonableness of a sentence for any given co-conspirator defendant. *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("The Government's legitimate concern that a lenient sentence [of probation] for a serious offense threatens to promote disrespect for the law is at least to some extent offset by the fact that seven of the eight defendants in this case have been sentenced to significant prison terms"). *See also United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008) (sentencing court has discretion to align codefendants' sentence to reflect degrees of culpability where disparities threaten to undermine confidence in the criminal justice system). Thus far, James' codefendants have received sentences between 42 and 250 months. Keiarry Dyette received the lowest sentence of 42 months for racketeering activity that included both drug distribution and trafficking in multiple firearms.

James' racketeering activity consists solely of drug distribution. He did not traffic in firearms. He was not involved in any of the alleged violent conduct attributed to a number of his codefendants. He was not a leader, manager, or decision maker of the racketeering enterprise. A time-served sentence fairly and accurately reflects his relative culpability and role in the enterprise.

Finally, a time-served sentence would mean that James will have served all of that sentence in custody in a jail cell. He will have lost the opportunity to serve the final portion of his sentence (up to one year) in a halfway house. *See* 18 U.S.C. § 3624(c)(1) Prerelease Custody ("The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility") (parenthesis in original). For the reasons set forth in James' Motion for Release Pending Plea and Sentencing, no part of the considerable delay in resolving James' case is due to his actions or inactions. The loss of the opportunity to serve a portion of a time-served sentence in a halfway house is another reason why a that sentence is sufficiently punitive.

### 3.     No Sentencing Enhancements Apply

The parties have agreed in the plea agreement that the advisory sentencing guideline range is properly calculated based on the drug weight alone with no additional enhancements. The Probation Office has asserted that two two-level enhancements apply, one for possession of a firearm during and in relation to a drug trafficking offense (U.S.S.G. § 2D1.1(b)(1)) and one

for maintaining a premises for the purpose of manufacturing or distributing a controlled substance (U.S.S.G. § 2D1.1(b)(12)).

Neither enhancement applies.

The firearm enhancement does not apply because there is no evidence that James ever possessed a firearm, or that a firearm was possessed by any of James' coconspirators in the course of any of the controlled buys. *See* PSR at ¶¶ 10-17. James was present during one controlled drug buy at which a co-defendant discussed a separate sale of a gun to the cooperating witness. But no gun sale took place that day and there is no evidence that a firearm was present at the location of and during the buy. The next day, that same co-defendant who talked about a gun sale the day before made a controlled sale of a firearm to the cooperating witness (James was in the co-defendant's car). But there was no drug sale that day. The drug sale and the gun sale were two separate events on two separate days. That evidence does not show that a firearm was present during a drug sale. *See* U.S.S.G. § 2D1.1(b)(1) App. Note 11 ("The enhancement should be applied *if the weapon was present*, unless it is clearly improbable that the weapon was connected with the offense) (emphasis supplied).

The stash house enhancement does not apply because there is no evidence that James "maintained" the premises for the purpose of manufacturing or distributing a controlled substance. To "maintain" a premises, a defendant must exercise dominion and control over the premises, not simply use it. Owning the premises, renting it in ones name, paying the rent or utilities, receiving mail at it, having the address on a driver's license, having a key, and keeping clothes there are things that could establish dominion and control. *See United States v. Jones*, 778 F.3d 375, 384 (1st Cir. 2015) ("The term 'maintains' is not defined either in the guideline or in its

7

statutory antecedent. The Sentencing Commission's commentary, designed to bridge this gap, instructs courts to consider, among other things, 'whether the defendant held a possessory interest in (e.g., owned or rented) the premises' and 'the extent to which the defendant controlled access to, or activities at, the premises'") (citation omitted) (emphasis in original).

Here, there is no evidence that James "maintained" a supposed stash house at 100 Fellsway West apartment 401. He did not live there. He lived in Dedham. *See* PSR at ¶ 58 ("Prior to his arrest for the instant offense, the defendant was residing" in Dedham). There is no evidence that he rented the Fellsway apartment in his name, paid for it, had a key to it, had clothes or belongings there, or in any way exercised dominion and control over it. *Id*. at ¶¶ 10-17. The evidence shows nothing more than that he "used" the premises to conduct one or more of the controlled buys. *Id*. at ¶¶ 12 and 14. Uses does not equal maintains.

For those reasons, the proper advisory guidelines calculation is as set forth and agreed upon by the parties in the plea agreement.

## Conclusion

For all of the foregoing reasons, the court should impose a sentence of time-served, deem the sentence fully served, order James' immediate release.

JAMES RODRIGUES
 By his attorney,

/s/ *E. Peter Parker*
E. Peter Parker
 B.B.O. #552720
Law Office of E Peter Parker
33 Bradford St
Concord, MA  01742
(617) 742-9099
peter@parkerslaw.com

Certificate of Service

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 27, 2025.

/s/ *E. Peter Parker*
E. Peter Parker